IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
DAVENPORT DIVISION

| | |
|---|---|
| MELINDA MYERS, BARBARA STANERSON, JOHN EIVINS, LIV KELLEY-SELLNAU, CHRISTOPHER TAYLOR, and SHUNA TOSA, on behalf of themselves and other similarly situated, | Case No. 3:19-cv-00081-SMR-SBJ |
| Plaintiffs, | ORDER ON PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT |
| v. | |
| IOWA BOARD OF REGENTS, | |
| Defendant. | |

Before the Court is Plaintiffs' Motion for Partial Summary Judgment. [ECF No. 66]. They ask the Court to hold that Defendant violated the Iowa Wage Payment Collection Law ("IWPCL") by paying its employees wages later than required by statute and did so intentionally, making it liable for liquidated damages. *Id.* Further, they request the Court hold that Defendant intentionally paid out vacation and sick benefits beyond the legally permissible time limit. *Id.* Defendant resists Plaintiffs' Motion. [ECF No. 69]. For the reasons below, Plaintiffs' Motion is GRANTED in part and DENIED in part.

## I.     BACKGROUND

### A.  Factual Background

### i.   The Old Pay Systems

Prior to this litigation, the University of Iowa Hospitals and Clinics ("UIHC") used two different systems to pay its employees before changing to a new system.

For one system, UIHC used a monthly pay structure. The pay periods would start on the first day of any given month and end on the last day of the same month.  [ECF No. 66-3 at 6]

(Black Depo.).  The base wage earned for the given month was paid on the first day of the following month.  [ECF No. 69-3 at 88] (University of Iowa Operations Manual).  Pay adjustments earned during the same pay period, such as "overtime, shift differentials, time without pay, and other adjustments," were paid one month in arrears.  [ECF No. 66-3 at 14] (Glanz Depo.).  This meant that on December 1, an employee was paid for their November salary and overtime adjustments from October.  [ECF No. 69-3 at 88].  UIHC used the system to pay overtime to eligible blue-collar employees and some healthcare professionals under the Fair Labor Standards Act of 1938 ("FLSA").  [ECF No. 66-3 at 6].

UIHC used a second system for healthcare professionals who were ineligible for overtime under the FLSA.  [ECF No. 66-3 at 8].  These employees could work up to two-hundred and forty hours over the course of six weeks at a predetermined base rate.  *Id.*  Any hours worked beyond the two-hundred and forty hours would be paid at one and a half times their base pay.  *Id.*  Payment for the base hours would be disbursed on the first of the next month, but payment for overtime would be dispensed the following month.  *Id.*  Under this system, an employee working the six-week period from May 5, 2019 to June 15, 2019 would be paid their base salary for the hours on July 1, 2019 and be paid for the overtime hours on August 1, 2019.  *Id.* at 9.

As it does under current policies, UIHC paid out an employee's vacation and sick leave when they left the organization.  [ECF No. 66-3 at 10].  A retiring employee would receive a payout of their vacation and sick time "one month after the last salary check."  *Id.*  This rule applied "unless the employee asks to receive those payments on their final salary check."  *Id.* at 11.

ii.   The New Pay System

On August 12, 2020, UIHC CEO Suresh Gunasekaran gave a live-streamed talk to UIHC employees at which he discussed numerous changes to UIHC's employee pay structures.  [ECF

2

No. 66-3 at 11].  For employees paid using a monthly structure, Gunasekaran announced that their

pay adjustments would be provided on a "biweekly instead of monthly" basis.  *Id.* at 12.  For FLSA

exempt employees, i.e., those who work two-hundred and forty hours over six weeks, Gunasekaran

stated UIHC was moving them to a system where they would work one-hundred and sixty hours

over four weeks.  *Id.*  UIHC enacted these policies on November 1, 2020.

Gunasekaran used the talk to provide a myriad of reasons behind the changes.  [ECF No.

66-3 at 26–30].  Two are relevant for the Motion.  First, he stated the "timeline and requirements

of pending litigation" was a reason for the changes.  *Id.* at 28.  Second, he said the new policy was

enacted to "align[] with Iowa Code."  *Id.*  He explained the new policy would promote compliance

with the requirement of "regular paydays within twelve days after the end of the pay period."  *Id.*

### B.      Procedural Background

The Amended Complaint contains three claims, all of which challenge the pay systems in

place before November 1, 2020.  [ECF No. 66].  Count I, brought under the IWPCL, alleges

Defendant failed to provide earned wage adjustments in a timely manner.  [ECF No. 46 ¶ 27].  On

May 17, 2021, the Court certified Count I under Federal Rule of Civil Procedure 23 as the "Wages

Class."  [ECF No. 62].  The "Wages Class" is defined as:

> All individuals who have worked for UIHC since August 19, 2017
> as members of the SEIU bargaining unit ("health care professional
> bargaining unit") or October 7, 2017 as a 'Merit, Merit Exempt, and
> Non-Exempt P&S' employee ("blue collar workers"), respectively,
> who have not received their earned wages until more than twelve
> days, excluding Sundays and legal holidays, after the end of the
> period in which the wages were earned.

*Id.* at 9.

Count II, also based on the IWPCL, maintains Defendant did not disburse vacation or

qualifying sick leave on the next regular payday after an employee's termination of employment,

contrary to statute.  [ECF No. 46 ¶ 34].  On May 17, 2021, the Court certified Count II as the

"Termination Class."  [ECF No. 62].  The "Termination Class" is defined as follows:

> All individual members of the SEIU bargaining unit ("health care
> professional bargaining unit") or "Merit, Merit Exempt, and Non-
> Exempt P&S" employees ("blue collar workers") who have worked
> for UIHC since October 7, 2017 and have since terminated their
> employment who have not been paid accrued vacation pay, or
> unused accumulated sick leave not to exceed $2,000 where the
> employee retired at age 55 or older, by the next regular payday after
> their employment was terminated.

*Id.* at 9.

Count III asserts Defendant failed to disburse overtime premium pay in the next regular

paycheck as required by federal law.  [ECF No. 46 ¶ 42].  On May 5, 2020, the Court conditionally

certified Count III as the "Overtime Pay Class."  [ECF No. 31].  The "Overtime Pay Class" is

defined as "[a]ll individuals who worked for the University of Iowa Hospitals and Clinics from

January 8, 2017, to the present and were classified as merit, merit-exempt, or non-exempt P&S for

purposes of overtime pay."  *Id.* at 23.  The Court's denial of qualified immunity, which is made as

part of its decision on class certification, is on appeal to the United States Court of Appeals for the

Eighth Circuit.  [ECF Nos. 34; 44].

On August 26, 2021, Plaintiffs filed a Motion for Partial Summary Judgment.  [ECF

No. 66].  In their Motion, Plaintiffs ask the Court to grant summary judgment on Counts I and II

of their Amended Complaint and find Defendant liable for liquidated damages for both.  *Id.*

Defendant filed its resistance on October 7, 2021.  [ECF Nos. 69–69-3].  Plaintiffs filed a reply

and supplemental appendix.  [ECF Nos. 72–72-3].  For the reasons below, Plaintiffs' Motion for

Partial Summary Judgment, [ECF No. 66], is GRANTED with respect to Count I and DENIED

with respect to Count II.

## II.   LEGAL STANDARDS

### A.  Summary Judgment

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Paulino v. Chartis Claims, Inc.*, 774 F.3d 1161, 1163 (8th Cir. 2014).  "A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case." *Amini v. City of Minneapolis*, 643 F.3d 1068, 1074 (8th Cir. 2011) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "If the moving party has met this burden . . . the non-moving party must set forth specific facts showing that there are genuine issues for trial." *Bankston v. Chertoff*, 460 F. Supp. 2d 1074, 1085 (D.N.D. 2006).  To preclude the entry of summary judgment, the nonmovant must make a sufficient showing on every essential element of its case for which it has the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  "The evidence is viewed 'in the light most favorable to the nonmoving party' and all reasonable inferences that can be drawn from the record are construed in that party's favor." *Pedersen v. Bio-Med. Applications of Minn.*, 775 F.3d 1049, 1053 (8th Cir. 2015) (quoting *Johnson v. Wells Fargo Bank, N.A.*, 744 F.3d 539, 541 (8th Cir. 2014)).

### B.  Iowa Wage Payment Collection Law ("IWPCL")

A statute that "regulates conduct for the public good or welfare is ordinarily remedial and liberally interpreted." *First Iowa State Bank v. Iowa Dep't of Nat. Res.*, 502 N.W.2d 164, 166 (Iowa 1993).  The IWPCL is one such statute. *Hornby v. State*, 559 N.W.2d 23, 26 (Iowa 1997). The primary consideration when applying these statutes, notably the IWPCL, is furthering the "public interest underlying th[e] remedial statute." *Gabelmann v. NFO, Inc.*, 606 N.W.2d 339, 344 (Iowa 2000).

5

The IWPCL is meant to "facilitate collection of wages owed to employees." *Condon Auto Sales & Serv., Inc. v. Crick*, 604 N.W.2d 587, 596 (Iowa 1999) (citing *Phipps v. IASD Health Servs. Corp.*, 558 N.W.2d 198, 201 (Iowa 1997)). Wages are "compensation owed by an employer for . . . [l]abor or services rendered by an employee, whether determined on a time, task, piece, commission, or other basis of calculation." *Andrew v. Hamilton Cnty. Pub. Hosp.*, 960 N.W.2d 481, 495 (Iowa 2021) (citing Iowa Code § 91A.2(7)(a)). Wages may be compensation owed for "[v]acation, holiday, sick leave, and severance payments which are due an employee under an agreement with the employer or under a policy of the employees." Iowa Code § 91A.2(7)(b).

The IWPCL mandates "[a]n employer shall pay all wages due its employees . . ." not "more than twelve days . . . after the end of the period in which the wages were earned." *Id.* § 91A.3(1). "An employer and employee may, upon written agreement which shall be maintained as a record, vary the provisions of this subsection." *Id.* The language in the agreement must expressly state the parties' agreement to depart from the statutorily prescribed deadlines. *Westegard v. Davis Cnty. Cmty. Sch. Dist.*, 580 N.W.2d 726, 729 (Iowa 1998).

"An employer who fails to pay wages to an employee as required under the law is liable to the employee for the unpaid wages, court costs, and attorney fees incurred in the recovery of the unpaid wages." *Condon,* 604 N.W.2d at 596 (citing Iowa Code § 91A.8). An employer who intentionally fails to pay their employees' wages is liable for the previously mentioned damages and statutorily defined liquidated damages. *Audus v. Sabre Comm'cns Corp.*, 554 N.W.2d 868, 874–75 (Iowa 1996). An employer intentionally fails to pay wages when they know wages are owed and do not pay them. *Jackson v. City of Ottumwa*, 396 N.W.2d 794, 796 (Iowa Ct. App. 1986).

### III.      ANALYSIS – Count I

#### A.  Untimely Payment of Wages

Plaintiffs and Defendant agree the wages in question were paid to employees.  [ECF Nos. 66 at 7; 69 at 3].  They disagree whether Defendant paid Plaintiffs' additional wages for overtime, shift differentials, and related specialty pay categories later than allowed by statute.  [ECF No. 66 at 1].  Specifically, Plaintiffs claim Defendant provided these shift differentials a month after the end of the appropriate pay period, which is beyond the twelve days allowed under statute.  *Id.* Defendant claims each Plaintiff is bound by two documents – an offer letter signed at hiring and a collective bargaining agreement – that constitute written agreements to alter the timing requirements set out in Iowa Code § 91A.3.  [ECF No. 69 at 3].  Neither document is sufficient to constitute a written agreement to vary the timing requirements in Iowa Code § 91A.3(1).  Because Defendant's policy violates the statute and its only defense is insufficient, Plaintiffs are entitled to summary judgment on Count I.

#### i.      Violation of Statute

The first question is whether the timing provisions violate Iowa Code § 91A.3(1).  The parties concur the policy in question would violate the statute if there were not an agreement to vary its provisions.  [ECF Nos. 66-1 at 7; 69-3 at 3; 72 at 1].  The Court agrees.

The UIHC policy states employees would be paid shift adjustments "one month in arrears." [ECF Nos. 66-3 at 6; 69-6 at 88].  For employees paid monthly, this policy meant they received shift adjustments the following month.  *Id.*  For employees paid on a six0week timeline, they would receive pay up to six weeks after they worked.  The policy led to employees being paid between twenty-eight to thirty-one days after the end of the pay period.  This delay is not allowed by the

Iowa Code, which requires an employer to tender payment of earned wages within twelve days of the end of a pay period.  Iowa Code § 91A.3.

ii.      Written Agreement

Defendant is liable for its untimely payment of wages unless they raise a genuine dispute of material fact that there was a written agreement varying the timing provisions of Iowa Code § 91A.3(1).  *See Cap. Fund 85 Ltd. P'ship v. Priority Sys., LLC*, 670 N.W.2d 154, 157 (Iowa 2003) ("The defendant has the burden to prove the affirmative defenses it raises.").  Although Defendant argues it had a written agreement to vary the paydays for Plaintiffs, its argument is unconvincing.

a.   Elements of a Sufficient Agreement

In *Westegard*, the Iowa Supreme Court considered whether the language contained in a collective bargaining agreement ("CBA") between employees and a school district was sufficient to vary the timing provisions found in Iowa Code § 91A.3(1).  580 N.W.2d at 729.  Although the decision did not explicitly identify the elements needed for an enforceable written agreement, it illuminates elements that such an agreement is likely to have.

First, there must be knowledge of the specific language that could waive statutory rights. *Westegard*, 580 N.W.2d at 727.  In *Westegard*, a union and school district negotiated a collective bargaining agreement.  As part of the process, the parties were aware of, considered, negotiated, and settled upon the following language: "[P]ayment for services rendered shall be monthly, with the 20th of each month being designated as the payroll date." *Id.*  Their awareness and knowledge of the language, as demonstrated by open discussion and negotiation around it, rather than one party presenting language to the other in a surprise fashion, appears fundamental to creating an adequate and enforceable agreement to vary the timing provisions of Iowa 91A.3(1). *Id.*

8

Second, any potential waiver or limitation of statutory rights in relation to Iowa Code § 91A.3(1) must be done clearly and explicitly. *Wright v. Universal Mar. Servs. Corp.*, 525 U.S. 70, 79–80 (1998) (waiver of statutory rights in a collective bargaining agreement must be clear and unmistakable); *Metro. Edison Co. v. NLRB*, 460 U.S. 693, 708 (1983) ("[W]e will not infer from a general contractual provision that the parties intended to waive a statutorily protected right unless the undertaking is 'explicitly stated.'")). Although *Metro Edison Co.* addressed the waiver of statutory rights in the context of a CBA, extending this requirement to individuals would carry out the purpose of the IWPCL by preventing unintentional waivers of its remedial statutory protections. *See Gabelmann*, 606 N.W.2d at 344.

Third, the agreement must be in writing. Iowa Code § 91A.3(1). It must be kept as a record that can later be produced when needed. *Id.* Although the statute is silent on who carries the burden of maintaining the record, compliance requirements "rest fairly on the party best equipped to financially bear it." *Gabelmann*, 606 N.W.2d at 344. Similar to *Gabelmann*, the employer has the resources to manage this requirement, especially since it is bringing the agreement as a defense to liability. *Id.*

Fourth, any ambiguity on whether a written agreement exists, as well as whether it is sufficient to vary the timing provisions of Iowa Code § 91A.3(1), should be resolved against the party seeking to vary the statutory deadlines. *Westegard*, 580 N.W.2d at 729. In *Westegard*, the Iowa Supreme Court held that even when a written agreement to vary the timing provisions in the statute expressly leaves some discretion to an employer, such as unilaterally determining when the pay period opens and closes, it must still use that discretion in compliance with Iowa Code § 91A.3. *Id.* In so holding, reviewing courts were effectively bound to resolve any ambiguities in favor of enforcing the statute's plain text, rather than the agreement. *Id.*

These requirements, which provide a meaningful inquiry into whether a written agreement is sufficient to vary the rights of a remedial statute, are supported by the text of the IWPCL.  As just discussed, Iowa Code § 91A.3(1) requires a written agreement to vary the timing provisions. This stands in sharp contrast with another provision of the IWPCL that only requires an agreement or employer policy to govern how vacation or sick leave, both forms of wages, are paid out.  *See* Iowa Code § 91A.4.  The exclusion of statutory language allowing an employer's general policies to change the timing provisions in Iowa Code § 91A.3 combined with its presence in Iowa Code § 91A.4 strongly suggests the IWPCL would not tolerate a definition of written agreement that is a simple implementation of the employer's policies.  *See Kucera v. Baldazo*, 745 N.W.2d 481, 487 (Iowa 2008) ("Legislative intent is expressed by omission as well as by inclusion, and the express mention of one thing implies the exclusion of others not so mentioned.") (quoting *Meinders v. Dunkerton Cmty. Sch. Dist.*, 645 N.W.2d 632, 637 (Iowa 2002)).

In sum, a written agreement to vary the timing provisions of Iowa Code § 91A.3(1) should contain at least the following elements: 1) knowledge; 2) clear and unmistakable adoption of the waiver; and 3) preservation of the written agreement.  *Westegard*, 580 N.W.2d at 727–729. Further, any ambiguities in the waiver language should be resolved against the party seeking to depart from the statute's mandatory provisions.  *Id.*

b.  Offer Letter and Handbook

Defendant submitted the offer letters signed by most named Plaintiffs when they accepted their job.  [ECF No. 69-3 at 3–10] (Taylor Offer Letter); (Tosa Offer Letter); (Stanerson Offer Letter); (Kelley-Sellnau Offer Letter).  It maintains these letters constitute written agreements to vary the timing provisions of Iowa Code § 91A.3(1).  *Id.*  Each letter contains language stating, "your employment will be governed by . . . the University of Iowa Operations Manual." *Id.*  The

Operations Manual says, "your paycheck on the first of each month is for your salary earned the previous calendar month." *Id.* at 88. The following line declares that if the person is "eligible for overtime, shift, pay, etc., these pay adjustments are paid one month in arrears." *Id.* Although Defendant argues that the letter and referenced language are sufficient to constitute an agreement to vary the timing provisions, the Court is not convinced.

First, there is no evidence in the record to suggest Plaintiffs had any knowledge of the alleged waiver contained in the offer letter, let alone engaged in discussion and negotiation on it. *See generally* [ECF Nos. 66-3; 69-3]. The record suggests the opposite. For instance, Plaintiff Christopher Taylor's letter states, "Your employment in this position will be governed by . . . the University of Iowa Operations Manual" and "copies of these documents can be made available for your review through your supervisor." *Id.* By not providing a written copy of the Operations Manual to Taylor, Defendant's conduct supports Plaintiffs' position that employees did not have any knowledge of the waiver. Defendant does not point to evidence that any Plaintiffs knew, discussed, or intended to negotiate away these protections.

Second, the offer letter does not constitute a clear and explicit written agreement modifying IWPCL protections. As discussed in *Metro Edison Co.*, a party must explicitly intend to waive a statutory right. 460 U.S. at 708. There is no explicit statement regarding waiver of the IWPCL provisions in the offer letter. Defendant effectively concedes this point because its argument is not that the offer letter itself contained language varying the timing provisions of Iowa Code § 91A.3(1), but that language in the handbook, which is reached by inferential steps, does.

Third, the incomplete production of the written agreements is troubling. Defendant did not produce an equivalent offer letter regarding named Plaintiff Melinda Myers. *See generally* [ECF No. 69-3]. Defendant did not produce such an offer letter regarding named Plaintiff John Eivins.

11

*Id.* Nor did Defendant submit information suggesting the offer letters were maintained in any manner provided for under Iowa Code § 91A.3(1) ("which shall be maintained as a record"). Defendant's failure to produce the agreements suggests it did not maintain the required records. Not complying with the statute's recordkeeping requirement undermines Defendant's argument that it intended the agreements to vary the timing provisions of Iowa Code § 91A.3(1).

Simply put, Defendant asks the Court to find there is a genuine dispute of material fact on whether Plaintiffs signed a written agreement to vary the protections of a remedial statute. It bases this argument on a handful of offer letters that indirectly reference a few sentences in a document that is hundreds, if not thousands, of pages long. It did not provide these documents to Plaintiffs. These letters are insufficient as a matter of law to the vary the provisions of Iowa Code § 91A.3(1).

### c.   Collective Bargaining Agreement

The parties do not dispute that collective bargaining agreements ("CBAs") are sufficient to constitute a written agreement to vary the timing provisions of Iowa Code § 91A.3(1). [ECF Nos. 69 at 6; 72 at 4]. This has been recognized by the Iowa Supreme Court. *See Westegard*, 580 N.W.2d at 728. Thus, the CBA negotiated by the American Federation of State, County, and Municipal Employees ("AFSCME") is sufficient to be a written agreement for this analysis.

### iii.   To Vary the Terms

The next step is to determine whether the language in the written agreement is clear enough to vary the timing provisions of Iowa Code § 91A.3(1). As explained below, the language in the offer letter plus subsequent handbook, as well as the language in the AFSCME CBA, are not enough to vary the provisions of this remedial statute.

a.   Elements to Vary a Term

In *Westegard,* the Iowa Supreme Court considered a CBA, which provided: "[p]ayment for services rendered shall be monthly, with the 20th of each month being designated as the payroll date.  Should the date fall on week-ends, or during vacation periods, the Board has the right to establish alternate dates to be designated annually."  580 N.W.2d at 727.  It contemplated two issues: 1) whether this language constituted an agreement to vary the regular monthly payday requirements of the statute and 2) whether it was an agreement to provide payments after the statutorily assigned twelve-day deadline.

On the first requirement, the court noted the language "establishes a regular monthly payday at consistent intervals."  *Westegard,* 580 N.W.2d at 729.  It "allows the school district to vary from the statutory 'consistent-intervals' requirement when the payday falls on a weekend or during a vacation period."  *Id.*  Based on this, it held the "contract provision is clearly a written agreement to vary the requirements of section 91A.3(1) *as they relate to the requirement of regular monthly paydays at consistent intervals from each other*."  *Id.* (italics in original).

On the second requirement, the court commented that "it is a stretch of the imagination, however, to interpret this provision as dealing with the second obligation imposed by section 91A.3(1) – to issue paychecks no more than twelve days from the end of the payroll period."  *Westegard*, 580 N.W.2d at 729.  This was because "the union contract is totally silent on cutoff dates and whether they must be within twelve days of the established paydays."  *Id.*  "The school district's discretion to set cutoff dates is limited by the parameters established by section 91A.3(1)" when such silence occurs.  *Id.*  The lack of explicit language was fatal to the school district's attempt to rely on the contract to adjust the statutory protections provided to its employees.  *Id.*

With this analysis in mind, the Court considers if the language in the offer letter plus subsequent handbook, as well as the AFSCME CBA, are sufficient to vary these provisions.

### b.   Offer Letter and Handbook

Defendant asserts the offer letter, which states employment is governed by the Operations Manual, is a written agreement to vary the terms of Iowa Code § 91A.3(1).  It bases this argument on the following language in the Operations Manual:

> Your paycheck on the first of each month is for your salary earned the previous calendar month.  If you are eligible for overtime, shift pay, etc., these pay adjustments are paid one month in arrears.  In other words, on December 1, you are paid for your November salary and any pay adjustments from October.

[ECF No. 69-3 at 88–89].

*Westegard* is instructive on how to read this paragraph.  The Operations Manual identifies a discrete start and end dates for pay periods.  *Id*.  It further identifies the pay day as the first business day immediately following the close of the pay period.  *Id.*  This language may constitute an agreement for employees to be paid one month in arrears if it were part of a written agreement.

However, the Court notes this language does not appear to apply to the employees paid on a six-week basis.  *Id.*  This is because the relevant section considers hourly employees paid on a biweekly basis, the monthly employees, as well as semester and year long academic appointments.  *Id.*  By virtue of this absence, the offer letter language may only apply to employees who are paid based on the expressly enumerated systems.  *See Marcus v. Young*, 538 N.W.2d 285, 289 (Iowa 1995) ("Expression of one thing is the exclusion of another").

### c.   AFSCME Collective Bargaining Agreement

Defendant maintains that certain terms in the AFSCME collective bargaining agreement are sufficient to vary the timing provisions of Iowa Code § 91A.3(1).  [ECF No. 69 at 6].

The relevant language states:

> The number of regular hours in the calendar year shall be multiplied by the hourly rate to calculate the annual salary.  The annual salary shall be divided by twelve (12) to calculate the monthly paycheck.  All other calculations with respect to employee's pay shall remain unchanged.  BOR employees who are currently paid semi-monthly shall continue to be paid semi-monthly.

[ECF No. 69-3 at 12] (AFSCME Collective Bargaining Agreement for 2017).

This language is quite similar to the language found in *Westegard*.  The language in this paragraph does not explicitly mention or identify any start or end dates for the pay periods.  *Id*.  It does not consider or identify whether paydays must occur within twelve days of the monthly paychecks.  *Id*.  The language stating, "all other calculations with respect to an employee's pay shall remain unchanged" does not identify how these other calculations are done or incorporate by reference any additional information.  *Id.*  As in *Westegard*, this language is too vague to vary the twelve-day requirement set forth by Iowa Code § 91A.3(1).

### iv.    Conclusion

Defendant admits it paid Plaintiffs their salary adjustments one month after the close of a pay period.  [ECF No. 69-3 at 88].  It did so despite Iowa Code § 91A.3(1) requiring the payments be provided to employees within twelve days of the end of a pay period.  [ECF No. 69-3 at 88].  This is a plain violation of the statute.  Defendant's argument that Plaintiffs signed written agreements to vary the timing provision such that it could provide late payment are unpersuasive.  This is because the offer letter and Operations Manual do not constitute an appropriate written agreement, while the AFSCME CBA does not contain specific enough language to vary the timing provisions of Iowa Code §91A.3(1).  Plaintiffs are entitled to summary judgment.

### B.   Intentionally Late Payment

Plaintiffs also seek a finding that Defendant intentionally paid their wages late.   *Id.* Defendant resists Plaintiffs' Motion on two grounds:  First, it maintains Plaintiffs are not entitled to recover liquidated damages for untimely payments.  [ECF No. 69-3 at 10].  Second, it states there is a genuine dispute of material fact whether UIHC acted in good faith.  [ECF No. 13–14]. Neither is persuasive and Plaintiffs are entitled to summary judgment on the issue.

### i.   Type of Damages

Plaintiffs claim they are eligible to recover liquidated damages if a court finds Defendant intentionally failed to pay them on time.  [ECF No. 66 at 10].  Defendant maintains the language of Iowa Code § 91A.8 limits the imposition of liquidated damages only to instances where wages are not paid.  [ECF No. 69-3 at 10–11].  The Court finds Iowa Code § 91A.8 allows for the recovery of liquidated damages against employers who untimely pay wages based on intentional conduct.

### a.   Background

Defendant asks the Court to limit the scope of Iowa Code § 91A.8 based on the reasoning in *Bernstein v. Bribriesco*, 797 N.W.2d 131 (Table), 2010 WL 5394318 (Iowa Ct. App. Dec. 22, 2010) (unpublished).  In its decision, the Iowa Court of Appeals held a party seeking to recover liquidated damages did not put evidence of individualized damages, such as inability to pay bills, into the record, which prohibited a finding in his favor.  *Id.* at *6.  It also noted, "liquidated damages are not available under chapter 91A in the absence of some unpaid wages" because damages "shall not exceed the amount of unpaid wages."  *Id.* (citing Iowa Code § 91A.2(6)).

"Unpublished opinions are not controlling precedent."  *United States v. Jordan*, 812 F.3d 1183, 1187 (8th Cir. 2016).  These decisions are "relevant insofar as they have 'persuasive value.'" *White v. Nat'l Football League*, 756 F.3d 585, 595 (8th Cir. 2014) (quoting 8th Cir. R. 31.1A).

These decisions may serve as persuasive authority if "it is the best evidence of state law." *Audino v. JPMorgan Chase Bank, N.A.*, Case No. 4:16-CV-00631-SMR-HCA, 2017 WL 7693387, at *4 (S.D. Iowa June 27, 2017) (citing *Allstate Indem. Co. v. Rice*, 755 F.3d 621, 624 (8th Cir. 2014)).

*Bernstein* is not the best interpretation of Iowa law for two reasons. First, the decision considered factors outside the Iowa Code's statutory language in its analysis. The Iowa Legislature defined "liquidated damages" as "the sum of five percent multiplied by the amount of any wages that were not paid . . . multiplied by the total number of days . . . on which wages were not paid." *Kiepe v. Goslar*, 2021 WL 1017135, at *8 (Iowa Ct. App. Mar. 17, 2021) (citing Iowa Code § 91A.2(6)). This language does not require an employee seeking liquidated damages against their employer to submit information about their personal injuries, as damages under the formula are calculated based on other information such as the unpaid wages. *Struve v. Struve*, 930 N.W.2d 368, 376–77 (Iowa 2019) (citing *Marcus*, 538 N.W.2d at 289) (discussing how exclusion of certain language from statutes prohibits their consideration by the courts)).

Second, *Bernstein*'s conclusion that "liquidated damages are not available under chapter 91A in the absence of some unpaid wages" would undermine the statutory language. Specifically, the reasoning in *Bernstein* would allow employers to avoid punishment for intentional untimely payment of wages. This occurs even though express statutory language requires "a regular payday shall not be more than twelve days . . . after the end of the period in which the wages were earned." Iowa Code § 91A.3(1). *Bernstein*'s interpretation makes this language in the statute meaningless, which is prohibited. Iowa Code § 4.4(2) ("in enacting a statute, it is presumed that the entire statute is intended to be effective."); *Star Equip., Ltd. v. State, Iowa Dept. of Transp.*, 842 N.W.2d 446, 455 (Iowa 2014).

b.   Plain Language of the Statute

"When interpreting a statute, our ultimate goal is to ascertain and give effect to the intention of the legislature." *John Deere Dubuque Works v. Weyant*, 442 N.W.2d 101, 104 (Iowa 1989). "[W]e begin with the words used in the statute." *State v. Nicoletto*, 862 N.W.2d 621, 624 (Iowa 2015). "We read the statute as a whole and give it its plain and obvious meaning." *In re Detention of Geltz*, 840 N.W.2d 273, 275 (Iowa 2013). A reviewing court seeks to make "a sensible and logical construction, which does not create an impractical or absurd result." *In re Detention of Swanson,* 668 N.W.2d 570, 574 (Iowa 2003) (cleaned up).

The relevant language from Iowa Code § 91A.8 states:

> When it has been shown that an employer has intentionally failed to pay an employee wages or reimburse expenses pursuant to section 91A.3, whether as the result of a wage dispute or otherwise, the employer shall be liable to the employee for any wages or expenses that are so intentionally failed to be paid or reimbursed, plus liquidated damages, court costs, and any attorney's fees incurred in recovering the unpaid wages and determined to have been usual and necessary.

The plain language of this statute is clear: When a party intentionally violates Iowa Code § 91A.3, the employer shall be liable for liquidated damages. Failure to pay wages in a timely manner constitutes a violation of the statute. Taken together, the Court understands this language to allow employees to recover liquidated damages from employers who intentionally pay them in an untimely manner in violation of Iowa law.

This interpretation of the statute has the added benefit of furthering the primary purpose of the IWPCL, which is "'to facilitate the public policy of allowing employees to collect wages owed to them by their employers.'" *Kaufmann v. Siemens Med. Sols., USA, Inc.,* 638 F.3d 840, 844 (Iowa 2011) (quoting *Hornby*, 559 N.W.2d at 26). By allowing employees to collect liquidated

damages from employers for intentional untimely payments of wages, the interpretation carries out the statute's express purpose of preventing this type of conduct.  Iowa Code § 91A.3(1).

ii.    Good Faith Dispute

Plaintiffs can recover liquidated damages in the amount set by statute for intentional untimely payment of wages, which leaves the Court to determine if they are appropriate.  Plaintiffs maintain Defendant was aware it owed Plaintiffs wages but chose to not timely pay them.  [ECF No. 66-1].  Defendant maintains it had a good faith, but mistaken belief that it was paying wages "consistent with the IWPCL," which is sufficient to stop the imposition of liquidated damages.  [ECF No. 69 at 14].  The Court finds two reasons why there is no genuine dispute of material fact.

First, a party's good faith, but mistaken belief about its legal duties does not excuse non-compliance with the law.  "We have long recognized the 'common maxim, familiar to all minds, that ignorance of the law will not excuse any person, either civilly or criminally.'"  *Jerman v. Carlisle, McNellie, Rini, Kramer, & Ulrich LPA*, 559 U.S. 573, 581 (2010) (quoting *Barlow v. United States*, 7 Pet. 404, 411 (1833)).  "An act may be 'intentional' for purposes of civil liability, even if the actor lacked actual knowledge that his conduct violated the law."  *Id.*  In some circumstances, intentional conduct could occur when an employer is "unaware of the relevant federal prohibition" or "acts with the distinct belief its [conduct] is lawful."  *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 536–37 (1999).

Second, the record shows numerous instances of Defendant being aware of its obligations under this statute and not performing them.  Defendant negotiated a bargaining agreement, which began on July 1, 2017, that stated, "The Employer agrees to comply with 91A of the Code of Iowa."  [ECF No. 69-3 at 12].  Roughly a year later, the Service Employees International Union reached out regarding its concerns on the timing of overtime and extra time payments in a slightly

different context, which the university rebuffed.  [ECF Nos. 66-3 at 31–33] (Jacobson and Wessels Email Exchange).  This evidence is enough for a jury to find Defendant was aware it owed wages to Plaintiffs by a certain date and chose to not pay them in a timely fashion.  In circumstances such as these, a finding of awareness and non-performance is sufficient to impose liquidated damages. *Jackson*, 396 N.W.2d at 796.

Defendant does not offer any evidence to counter or rebut Plaintiffs' arguments.  [ECF No. 69-3 at 13–15].  Nor does it offer documents or statements to suggest it had a good faith belief in its compliance with Iowa Code § 91A.3.  [ECF Nos. 69; 69-1; 69-2; 69-3].  In light of this, "[i]t would be speculative to find, on this record, that [untimely] payment was due to either a good faith dispute that the wages were owed or an inadvertent failure to pay."  *See Olver v. Tandem HCM, Inc.*, 2010 WL 4885252, at *3 (Iowa Ct. App. Nov. 24, 2010).

### iii.    Conclusion

The record before the Court demonstrates there is no genuine dispute of material fact on the following issues: 1) Defendant untimely paid Plaintiffs their shift adjustments by paying them one month in arrears; 2) the items offered by Defendant do not constitute written agreements to vary the timing provisions of Iowa Code § 91A.3(1) and; 3) Defendant intentionally engaged in paying Plaintiffs' their wages in an untimely manner, which triggers liquidated damages as calculated by Iowa Code 91A.2(6).  Plaintiff's Motion for Summary Judgment on Count I of the Amended Complaint is GRANTED.

### B.    Vacation and Sick Leave – Count II

Plaintiffs and Defendant contest whether Defendant paid Plaintiffs' vacation and sick leave later than allowed under statute.  [ECF Nos. 66 at 2; 69-3 at 13].  They debate if liquidated damages are available for untimely termination benefits.  *Id.*  Defendant's argument is more persuasive.

i.    Applicable Law

An employee bringing a claim for failure to pay earnings under the IWPCL carries the burden of proving the benefits in question constitute wages. *Am. Fam. Mut. Ins. Co. v. Hollander*, 705 F.3d 339, 349 (8th Cir. 2013).  This burden applies to employees seeking to prove that "unused accrued PTO was due as wages under chapter 91A at the time of . . . termination." *Viafield v. Engels*, 885 N.W.2d 830 (Table), 2016 WL 4054175, at *2 (Iowa Ct. App. July 27, 2016).  An employee may prove these wages were due by demonstrating the existence of an agreement or employment policy to that effect. *Id.*  They must prove this "by a preponderance of the evidence." *Crookham v. Structural Contractors, Ltd.*, 466 N.W.2d 277, 278 (Iowa Ct. App. 1990).  A plaintiff's failure to produce an agreement or employment policy is fatal their claim. *Peniska v. Davita, Inc.*, 776 N.W.2d 301 (Table), 2009 WL 3064639, at *1 (Iowa Ct. App. Sept. 17, 2009).

Plaintiffs meet this portion of their burden.  First, wages include compensation for vacation and sick leave that are due under an agreement with an employer.  Iowa Code § 91A.2(7).  Second, they produce significant information on the existence of payout procedures for these benefits. [ECF No. 66-3].  They submit the University of Iowa's Benefits Overview and Enrollment page, which contains a frequently answered questions section.  *Id.* at 25.  A question on the page is "What happens to my sick leave and vacation when I terminate employment?"  *Id.*  The University's response is "Vacation pay will be paid out to you on the first of the month after your final paycheck . . . You are not paid for sick leave unless you are retiring."  *Id.*  The answer further explains "[i]f you are 55 or older when you terminate, you will be eligible for a one-time payout of up to $2,000 for accumulated sick leave credits."  *Id.*  They also provide deposition testimony that this this policy applied to UIHC.  *Id.* at 10–11.  Plaintiffs met their burden of proving a policy.

ii.     Untimely Payment

The next step of this analysis asks two questions:  First, whether wages were due under the policy.  Second, if so, were they timely paid? The record demonstrates wages were not due under UIHC policy.  Further, there is no evidence the benefits were untimely paid under the policy.

a.     When Are Wages Due?

Wages such as sick leave are only payable upon the occurrence of a condition described in the agreement or policy.  *See Willets v. City of Creston*, 433 N.W.2d 58, 63 (Iowa Ct. App. 1988). The parties may agree that requirement for payment is "sickness, termination, or retirement."  *Id.* If the condition is termination, it should be "construed in its broadest sense to include all situations where the employee-employer relationship is permanently severed."  *Williams v. Davenport Commc'ns Ltd. P'ship*, 438 N.W.2d 855, 857 (Iowa Ct. App. 1989).

The language of the policy states that vacation will be paid out on the first of the month after the final paycheck, while sick leave will be paid out only if the employee is 55 or older when terminated.  The causal event for payment of vacation leave is termination of employment.  Based on this language, vacation wages only become due under Iowa Code § 91A.4 upon the date in the policy, but an employee may request them sooner.  Meanwhile, the triggers for payment of sick leave are termination and the employee being 55 years of age or older; once these events occur, the wages are due on the dates detailed in the policy.

b.     Untimely Payment of Wages

Plaintiffs have not submitted any evidence that vacation or sick leave were paid after the dates established in the policy.  [ECF Nos. 66-1; 66-3].  Per deposition testimony, Plaintiff Liv Kelley-Sellnau submitted her resignation effective April 26, 2019, which means she would have received her final regular paycheck on May 1, 2019 and she would have received unused vacation

on June 1, 2019.  *Id.* at 11.  Plaintiffs did not submit information suggesting she or any other employees received payment for vacation on dates different than the ones set under policy.  *See* [ECF No. 66-3].  Thus, Plaintiffs have not met their burden.

### iii.    Conclusion

The record demonstrates that there are no genuine disputes of material fact regarding any of these issues: 1) UIHC has a policy that an employee will be paid vacation leave upon their termination; 2) UIHC has a policy that any employee over fifty-five will be paid sick leave upon termination; 3) UIHC's policy is that these wages will be paid out on the first of the month after the employee's final paycheck; and 4) Plaintiffs have not submitted any evidence that employees received these payments in an untimely manner.  Accordingly, Plaintiff's Motion for Summary Judgment on Count II of the Amended Complaint is DENIED.

### IV.    CONCLUSION

For the reasons above, Plaintiffs' Motion for Summary Judgment, [ECF No. 66], is GRANTED in part and DENIED in part.  The Motion is GRANTED on Count I of the Amended Complaint.  The Motion is DENIED as to Count II.

IT IS SO ORDERED.

Dated this 29th Day of March, 2022

_____
STEPHANIE M. ROSE, CHIEF JUDGE
UNITED STATES DISTRICT COURT